H. B. CHAFFEE MFG. CO. v. SELCHOW et al.

(Circuit Court, S. D. New York. June 24, 1904.)

1. TRADE-MARKS—NAMES OF GAMES.

The inventor of a game, by giving it a distinct name, and selling it under such name, may obtain a trade-mark in the name, though he never copyrighted or patented the game.

2. SAME—GENERIC NAMES.

The generic name of a thing is not the subject of a trade-mark.

3. SAME—OWNERSHIP.

Defendants' assignor invented a game to which he applied the name "Flinch," after which, under an arrangement with various assignors of complainant, the game was put up in boxes, and sold with indifferent success; and, on the failure of one of the firms owning the business, to which the complainant succeeded, its assets, including its trade-marks, were sold to complainant under a judicial sale. The original inventor of the game, however, continued to manufacture and sell the same; and thereafter he and his executrix transferred all his rights and ownership, including the trade-mark in the name of "Flinch," to defendant. *Held*, that complainant and its assignors, by simply making and selling the game, could not acquire a trade-mark in the name as against defendants.

In Equity.

A. Bell Malcolmson, for complainant.

Frederick C. McLaughlin and Fred. L. Chappell, for defendants.

HOLT, District Judge. This is an action to restrain the infringement of a trade-mark. The complainant alleges that it owns a trade-mark in the word "Flinch," the name of a game of cards. About the year 1893, Eugene H. Munger, a clerk in a dry goods house in New York, invented a game, to which he gave the name of "Flinch," to be played with cards on which were printed various numbers. The rules of the game prescribe that, if a player makes a certain play, his adversary can call, "Flinched," and thereby gain an advantage, which I presume is the origin of the name. Munger arranged with a friend named Myers to print the cards. He originally had a few put up in boxes covered with plaid colored paper, without any name upon the boxes. About 1894 Munger entered into negotiations with Elisha G. Selchow, a member of the firm of Selchow & Righter, of New York, dealers in games, with a view to having them take up and market the game of Flinch for him. Elisha G. Selchow's son, Frederick M. Selchow, was then engaged in the business of manufacturing toys and games in New York, and his father, Elisha Selchow, arranged to have Frederick Selchow make some boxes in which to put up and sell the cards. Frederick Selchow got up a black box on which the word "Flinch" was printed. Elisha Selchow obtained the printed cards from Munger, and delivered them to his son Frederick Selchow, who made the boxes and arranged the cards in them for sale. The firm of Selchow & Righter attempted to sell them for Munger, but did not meet

¶ 2. See Trade-Marks and Trade-Names, vol. 46, Cent. Dig. § 11.

Arbitrary, descriptive, or fictitious character of trade-marks and trade-names, see note to Searle & Hereth Co. v. Warner, 50 C. C. A. 323.

with much success. On September 25, 1895, Elisha Selchow wrote Munger a letter, stating:

"Your game of Flinch, I am sorry to say, has not been a success. We have not sold what we bought of you last year, and we made a cheaper edition, and even that does not sell. If I can see any way in which to dispose of the lot which you now have on hand at a lower price, I will communicate with you later."

In 1896 Herbert B. Chaffee entered into partnership with Frederick M. Selchow. Chaffee was to contribute cash capital, and Selchow was to put in the assets of his business. An inventory was prepared. The inventory has been lost, and is not in evidence; but I am satisfied that the inventory contained, among a statement of other assets, a list of games, in which was included the name Flinch. The firm of Chaffee & Selchow was succeeded in 1901 by a corporation which took over the firm's assets, called the Chaffee & Selchow Company. This company got into financial difficulties; and all its assets, including its trademarks, were sold out by the sheriff, and were purchased by and transferred to the complainant, the H. B. Chaffee Manufacturing Company, which now claims to own the trade-mark by reason of this transfer. The complainant claims that Frederick M. Selchow, before the formation of the firm of Chaffee & Selchow, and that firm after its formation, sold a considerable quantity of the game, done up in the black boxes marked "Flinch," and thereby obtained a trade-mark in the name, and an exclusive right to make and sell the game under that name. It is admitted that Munger never formally transferred any rights in the game to either of the Selchows, or to the firm of Chaffee & Selchow, or to the Chaffee Manufacturing Company. Both the Selchows assert that Frederick M. Selchow never owned the game, or a trade-mark in the name; that he never transferred either to Chaffee & Selchow; that Munger had the cards printed by Myers; that Frederick M. Selchow simply manufactured the boxes, and put up the cards in them; that Selchow & Righter sold the game for Munger, but that the attempt to sell the game was substantially a failure; and that they stopped selling it in 1895. Frederick M. Selchow says that, at the time the firm of Chaffee & Selchow was formed, he had a number of uncut sheets of the cards, which Munger had furnished him; that they were the things described in the inventory as "Flinch"; and that they were afterwards cut up and used in the manufacture of another game called "Laughter." Munger, after 1895, always kept a stock of the games in a closet in his house, and sold a few from time to time, in boxes made by Frederick M. Selchow, or Chaffee & Selchow, but the evidence shows that after 1896 the sales by him were inconsiderable.

About 1901 a member of the firm of Beecher & Kymer, engaged in the book and stationery business in Kalamazoo, Mich., became acquainted with the game of Flinch, and tried unsuccessfully to find who had it for sale. Thereupon Beecher & Kymer began to manufacture and sell the game, and in 1902 registered the name "Flinch" as their trade-mark in the Patent Office at Washington. Munger, in 1902, hearing that they were manufacturing and selling the game, notified them that he was the owner of it, and objected to their manufacturing it or dealing in it without his consent. Thereupon they entered into negotiations

with him which resulted in his entering into a contract with them for the sale to them of his rights in the game. He died shortly after, and his executrix made a formal transfer of all his rights and ownership in the game, including the trade-mark in the name "Flinch," to Beecher & Kymer, who adopted the name of the Flinch Card Company for that portion of their business relating to this game. The Flinch Card Company, after it began to manufacture the game, advertised it extensively, and a demand thereupon arose for it in the trade. In February, 1903, the complainant sent out a circular to the trade as follows:

"We beg to inform you that we have in preparation and shortly to be issued the old game of 'Flinch,' the same which we formerly published under that title.

"We offer it to you at $36.00 per gross, and will guarantee that if prices go lower, we will, at our option, either meet the market price or take back the goods you have left."

The complainant accordingly brought out the game anew. Thereafter the Flinch Card Company continued to manufacture and sell the game, and the defendants Selchow & Righter purchased the game from them and sold it, and their sale constitutes the alleged infringement which this suit is brought to restrain. The Flinch Card Company is conducting the defense of this action on behalf of Selchow & Righter.

In considering the legal questions arising upon these facts, it is important at the outset to apprehend clearly what the complainant's claim is. It claims a trade-mark in the word "Flinch." It does not, as I understand it, claim an exclusive right to make and sell the game. Its claim is that no one else can sell it under the name Flinch. If it claimed an exclusive ownership in the game, its claim would be clearly invalid. Munger invented the game and named it. When he had completed his invention he owned it, and therefore had an exclusive right to it. But in order to retain an exclusive right to the game after selling it to the general public, he would have been obliged to copyright it or patent it. The invention of such a game, consisting of printed cards, can probably be protected by copyright or by registry in the Patent Office. For instance, playing cards of a certain style have been copyrighted as prints. Richardson v. Miller, 3 Law & Eq. Rep. 614, Fed. Cas. No. 11,791. And see, generally, Drone on Copyright, p. 178, and cases cited. The inventor, if he did not copyright it or patent it, by giving it a distinctive name and selling it under such name, could probably obtain a trade-mark in the name; but if the inventor of such a game gives it a distinctive name, and then makes it and sells it, or permits it to be sold, without copyrighting it or patenting it, I do not see how any other person, by simply making it and selling it, can obtain a trade-mark in its name. The general rule is that the generic name of a thing is not the subject of a trade-mark. Browne on Trade-Marks, §§ 87–91; Paul on Trade-Marks, § 35. If chess or golf or whist were now invented and named, could any manufacturer or vendor of the implements with which such games are played obtain a trade-mark in their names by selling such implements put up in boxes marked with the names of the games? He, of course, could adopt a trade-mark to distinguish the chessmen or the playing cards or the golf clubs which he made from those made by others, but I think he could not acquire

a trade-mark in the names of the games by simply selling the games after they had become known to the public under such names.

In view of these considerations, I cannot see anything in the evidence to show that the complainant has a trade-mark in the word "Flinch." Munger invented the game and named it, and, after he had done so he owned it, just as the author of a book owns it after he has written it. He never specifically transferred the ownership of it, or any trade-mark in its name, to either of the Selchows or the successors of either of them. I think, upon the evidence, that neither Frederick M. Selchow nor Chaffee & Selchow nor the complainant sold the game to any extent before 1903. If they did, there is no evidence that Munger consented to it. Selchow & Righter did sell the game about 1895 to some extent, but I think the evidence shows that they substantially abandoned the sale from that time until about 1903. Munger, however, continued to sell the game in a small way all the time until his death. If any one retained the exclusive ownership of the game and of the trade-mark in the name, Munger did, and the contracts which he and his executrix made with the Flinch Card Company transferred whatever ownership he had to them. Even if it should be considered that either of the Selchows or either of their firms ever had any rights in the game or the name before 1895, I think they abandoned them about 1895. The complainant's circular to the trade, issued in 1903, announces that they "have in preparation and shortly to be published the old game of 'Flinch,' the same which we formerly published." The circular offers the game at a certain price and guaranties that, "if prices go lower," they will either "meet the market price or take back the goods." Such a circular, in my opinion, is entirely inconsistent with the complainant's present claim that it and its predecessors have continuously sold the game, or have a trade-mark in the name "Flinch," which gives them an exclusive right to sell it under that name.

It is not necessary in this case to decide whether the Flinch Card Company owns the trade-mark. It is sufficient to say that, in my opinion, the complainant, the H. B. Chaffee Manufacturing Company, never owned it.

My conclusion is that the bill should be dismissed, with costs.