**ANTI–MONOPOLY, INC.,**
Plaintiff-Appellant,

v.

**GENERAL MILLS FUN GROUP et al.,**
Defendants-Appellees.

No. 77–2302.

United States Court of Appeals,
Ninth Circuit.

Dec. 20, 1979.

Robert B. Chickering (argued) of Warren Chickering & Grunewald, and John H. Denton, Oakland, Cal., for appellant Anti-Monopoly, Inc.

Robert S. Daggett (argued) of Brobeck, Phleger & Harrison, San Francisco, Cal., and Oliver P. Howes of Nims, Howes, Collison & Isner, New York City, for defendants-appellees.

Before WALLACE and SNEED, Circuit Judges, and BLUMENFELD,* District Judge.

WALLACE, Circuit Judge:

Anti-Monopoly, Inc. (Anti-Monopoly) appeals from a district court judgment declaring that the MONOPOLY trademark of Parker Brothers, an unincorporated division of General Mills Fun Group, Inc., is valid and enforceable, and that Anti-Monopoly's use of the name "Anti-Monopoly" as the title of its own game constitutes an infringement thereof. Anti-Monopoly also appeals from the district court's issuance of a permanent injunction which, among other things, forbids Anti-Monopoly from using the words ANTI–MONOPOLY as a trademark, or trade or corporate name, and which requires Anti-Monopoly to submit all offending materials for destruction. We reverse and remand the case to the district court for further findings concerning the validity and enforceability of the MONOPOLY trademark.

## I

The game of "Monopoly" was first played from 1920 to 1932 on various college campuses by a small group of individuals, many of whom were related by blood or marriage. In late 1932 or early 1933 one of these players introduced Charles Darrow to the game, and gave him a handmade game board, rules, and associated equipment. Immediately thereafter Darrow commenced commercially producing and selling "Monopoly" game equipment.

In October 1933, Darrow obtained a copyright on some part of the "Monopoly" game equipment, probably the rules. In March 1935, Parker Brothers acquired all of Darrow's rights to the "Monopoly" game and game equipment. In August 1935, Darrow applied for a patent. The application stated:

> This invention relates to board game apparatus and is intended primarily to provide a game of barter, thus invoking trading and bargaining.
>
> . . . . .
>
> The board as a whole is indicated . . in Fig. 1. Inasmuch as the game is known upon the market as Monopoly, that game is indicated [in the middle of the board as pictured in fig. 1].

The patent issued on December 31, 1935 and was promptly assigned to Parker Brothers. It expired 17 years later, in 1952.

Parker Brothers registered the word MONOPOLY as a trademark in 1935 and 1936. It remains the owner of trademark registration numbers 326, 723, issued July 30, 1935, and 38,834, issued September 15, 1936, for the MONOPOLY trademark.

During the years 1935 to 1952, Parker Brothers relied primarily on its patents to protect its monopoly of "Monopoly." When the patent expired, however, Parker Brothers began to concentrate on preserving the value of its MONOPOLY trademark. Parker Brothers eliminated references in the game rules to becoming the "monopolist." It also created the "generic" expression "real estate trading game equipment," which it used in conjunction with the MONOPOLY trademark on the game carton and in advertisements. Parker Brothers apparently hoped by these steps to keep the word MONOPOLY from falling into the public domain as a "generic" term. The major question which we reach on appeal is whether Parker Brothers succeeded.

In December 1973, Anti-Monopoly, headed by its president, Ralph Anspach, first

---

* Honorable M. Joseph Blumenfeld, United States District Judge, District of Connecticut, sitting by designation.

marketed "Anti-Monopoly," a game which Anspach created. Anspach asserts that the game is designed to emphasize the values of the competitive private enterprise system. At first he intended to market his game under the title, "Bust the Trust, The Anti-Monopoly game," but he later decided that "Anti-Monopoly" would be a better title. The United States Patent and Trademark Office rejected Anti-Monopoly's 1973 trademark application because of the possibility of confusion, mistake, or deception. For reasons of its own, Anti-Monopoly chose not to pursue this application any further.

Anti-Monopoly, which has sold over 400,000 of its games, sought a declaratory judgment that the MONOPOLY trademark is invalid and that its use of the name "Anti-Monopoly" does not infringe the MONOPOLY mark. In addition, Anti-Monopoly sought to have the MONOPOLY trademark cancelled. Parker Brothers counterclaimed for the declaratory and injunctive relief which the district court granted, and from which Anti-Monopoly now appeals.

Anti-Monopoly raises four principal contentions in its appeal: (1) That for a variety of reasons, the district court erred when it concluded that the MONOPOLY trademark had not been invalid originally or since become invalid; (2) That the district court erred when it found that Anti-Monopoly had infringed the MONOPOLY trademark; (3) That the district court erred because it did not find that the equitable defense of "unclean hands" barred injunctive relief in favor of Parker Brothers; and (4) That the district court erred when it rejected Anti-Monopoly's demand for a jury trial. We consider each of these contentions in turn.

## II

The invalidity issue is not one of easy resolution. Both parties agree that Parker Brothers' MONOPOLY trademark has become incontestable unless: (1) MONOPOLY

was, when Parker Brothers first registered the mark, or has since become, the common descriptive name ("generic" name) of the registered article, 15 U.S.C. §§ 1064(c), 1065(4); or (2) Parker Brothers obtained its registration fraudulently, 15 U.S.C. § 1064(c). During final argument in the district court, however, counsel for Anti-Monopoly conceded that he had failed to prove fraud. Thus, Anti-Monopoly's sole remaining contention regarding the invalidity of the MONOPOLY trademark is that the term Monopoly was originally or has become the generic name for an article.

### A. The Genericness Doctrine

■ The United States encourages invention and development of new products, ideas, and systems by granting, pursuant to the patent laws, limited monopolies over the manufacture and sale of such products. *See* U.S.Const. art. I, § 8, cl. 8; 35 U.S.C. § 1 *et seq.* But patent protection is a sharply confined exception to a general "principle of free competition in business ideas and intellectual creations." 1 J. McCarthy Trademarks and Unfair Competition, § 1:1 at 2 (1973).[1] Thus, when a patent expires, the idea, system, or product passes into the public domain and may be freely copied, so long as the copyist uses reasonable care to prevent the public from misidentifying his product as that of the original producer. *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 117–19, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *Saxlehner v. Wagner*, 216 U.S. 375, 381, 30 S.Ct. 298, 54 L.Ed. 525 (1910); *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185–86, 16 S.Ct. 1002, 41 L.Ed. 118 (1896).

■ Trademarks, *see* 15 U.S.C. § 1051 *et seq.*, are not properly used as patent substitutes to further or perpetuate product monopolies. *Smith v. Chanel, Inc.*, 402 F.2d 562, 566–69 (9th Cir. 1968). Rather, trademark policies are designed

---

1. The copyright laws are not involved in this case because business ideas, such as a game concept, cannot be copyrighted, *see* 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1880). This copyright rule is analogous to the genericness doctrine of trademark law, however, in that it is designed to prevent extension of product monopolization beyond the 17 years protected by a patent. *Id.* at 102–03.

(1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition.

*HMH Publishing Co. v. Brincat*, 504 F.2d 713, 716 (9th Cir. 1974). Buyers may especially trust the constancy of quality emanating from a particular producer. Trademarks enable producers to capitalize on such goodwill, by providing a sure method of identifying a particular producer's goods to the public. Used as a means of identifying the trademark owner's products, a trademark "makes effective competition possible in a complex, impersonal marketplace by providing a means through which the consumer can identify products which please him and reward the producer with continued patronage." *Smith v. Chanel, Inc., supra*, 402 F.2d at 566.

■ Moreover, once this goodwill is established, trademarks become an extremely important medium of advertisement. Provided that the public continues to understand the trademark term primarily as a source identifier, the particular producer is exclusively entitled to benefits flowing from the mark's sales appeal.[2]

■■ Thus, "[t]he trademark can be a potent weapon in the competitive contest, for it guarantees, identifies, and sells the article to which it refers." 3 R. Callman, Unfair Competition, Trademarks, and Monopolies § 65 at 3 (1969). But all of these legitimate trademark purposes derive ultimately from the mark's representation of a single fact: the product's source. It is the source-denoting function which trademark laws protect, and nothing more. *See Smith v. Chanel, Inc., supra*, 402 F.2d at 566–69. The trademark is misused if it serves to

limit competition in the manufacture and sales of a product. *Id.* That is the special province of the limited monopolies provided pursuant to the patent laws.

■ The genericness doctrine in trademark law is designed to prevent such anti-competitive misuse of trademarks. At its simplest, the doctrine states that when a trademark primarily denotes a product, not the product's producer, the trademark is lost. As we have stated, "one competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods." *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir.), *cert. denied*, 400 U.S. 916, 91 S.Ct. 174, 27 L.Ed.2d 155 (1970). Thus, the Lanham Act, enacted in 1947, provides for the cancellation of a trademark if "at any time [it] becomes the common descriptive name of an article or substance." 15 U.S.C. § 1064(c). Further, "no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise." 15 U.S.C. § 1065(4). Courts equate "common descriptive name," as used in the statute, with the shorthand expression "generic term." *See, e. g., Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

The operation of genericness doctrine is well illustrated by the *Shredded Wheat* case, *Kellogg Co. v. National Biscuit Co., supra*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73. National Biscuit, and its predecessor, Perky, the inventor of a product which it called "Shredded Wheat," had enjoyed a patent on the manufacture of the so-named shredded, pillow-shaped, wheat biscuits from 1895 to 1912. After the patent expired, Kellogg began to manufacture an identical biscuit which it also called "Shredded Wheat." National obtained an injunction from a district court prohibiting Kellogg's use of the trade name "Shredded

---

**2.** The owner of a widely recognized trademark cannot, however, prevent a competitor from referring to the owner's mark in the context of comparative advertising. This is so despite the benefits which the competitor reaps from the product recognition engendered by the owner's popularization, through expensive advertising, of the mark. *E. g. Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968).

Wheat." The Supreme Court reversed. It stated that once the patent on "Shredded Wheat" had expired, the right to make the product passed into the public domain. 305 U.S. at 118, 59 S.Ct. 109. It said further: "As Kellogg Company had the right to make the article, it had, also, the right to use the term by which the public knows it." *Id.* at 116–17, 59 S.Ct. at 113.

National contended that even if the public did use the term "Shredded Wheat" generically, to denote an article, National nevertheless had "the exclusive right to the name 'Shredded Wheat,' because those words [had] acquired the 'secondary meaning' of shredded wheat made at Niagara Falls by [National's] predecessor." *Id.* at 118, 59 S.Ct. at 113. The Court rejected this argument, saying:

> There is no basis here for applying the doctrine of secondary meaning. The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. But to establish a trade name in the term "shredded wheat" the plaintiff must show more than a subordinate meaning which applies to it. *It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer.* This it has not done. The showing which it has made does not entitle it to the exclusive use of the term shredded wheat, but merely entitles it to require that the defendant use reasonable care to inform the public of the source of its product.

*Id.* at 118–19, 59 S.Ct. at 113–14 (emphasis supplied).

The Court also stated:

Kellogg Company is undoubtedly sharing in the goodwill of the article known as "Shredded Wheat"; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that is not unfair. Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested. There is no evidence of passing off or deception on the part of the Kellogg Company; and it has taken every reasonable precaution to prevent confusion or the practice of deception in the sale of its product.

*Id.* at 122, 59 S.Ct. at 115 (footnote omitted).

■ The genericness doctrine has undergone little change since the *Shredded Wheat* case.[3] Thus, the MONOPOLY trademark is valid only if "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* at 118, 59 S.Ct. at 113. Even if only one producer—Parker Brothers—has ever made the MONOPOLY game, so that the public necessarily associates the product with that particular producer, the trademark is invalid unless source identification is its primary significance. *Id.*

■ One way courts have analyzed genericness is to ask whether a term "has come to be understood as referring . . . to the genus of which the particular product . . . is a species." *Surgicenters of America, Inc. v. Medical Dental Surgeries Co.,* 601 F.2d 1011, 1014 (9th Cir. 1979); *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9. The distinction is between a broad classifying term—the genus—and a specific sub-classifier—the spe-

---

**3.** *See, e. g., Helene Curtis Industries, Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1332 (7th Cir. 1977) (en banc), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577, 580 (2d Cir. 1963); *Feathercombs, Inc. v. Solo Prods. Corp.,* 306 F.2d 251, 256 (2d Cir.), *cert. denied,* 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.,* 343 F.2d 655, 666 (7th Cir. 1955); *Nissen Trampoline Co. v. American Trampoline Co.,* 193 F.Supp. 745, 748–49 (S.D.Iowa 1961).

cies. As a hypothetical example, suppose several manufacturers produce game equipment for playing chess. Chessco's chess game is called EN PASSANT. When a consumer has available in his vocabulary the broad classifier "chess," but instead asks for EN PASSANT, we can infer that the consumer wants the "species" of chess equipment produced by Chessco. The consumer may have innumerable reasons for desiring EN PASSANT chess equipment: e. g., price, style, durability, consistency of quality, goodwill engendered by a catchy commercial jingle, or simply a liking for the sound of the trademark. But these desired characteristics are all source-particular, in that they correlate with a given producer, Chessco. The consumer thus uses the term EN PASSANT exactly as a trademark should be used—to enable him to recognize and ask for a particular producer's chess equipment. Moreover, Chessco benefits precisely as a producer should from a trademark: it reaps profits from consumer goodwill—both as to quality of its goods and attractiveness of its advertising—associated with its unique personality in the marketplace. It is important to recognize that the species term EN PASSANT subcategorizes only as to source. For trademark genericness purposes, it is the source-denoting function of EN PASSANT which causes us to call EN PASSANT a species instead of a genus.

A genus, in contrast to a species, is a product category including essentially interchangeable[4] goods made by unique producers. To the extent the goods within the genus differ, their distinguishing characteristics are primarily source-particular, e. g., price, quality, and advertising jingle. When, in the consumers' minds, the characteristics which distinguish a particular product are no longer primarily source-particular, that product becomes its own

genus, and its name becomes a generic name. *See Dixie Rose Nursery v. Coe,* 76 U.S.App.D.C. 371, 372, 131 F.2d 446, 447 (D.C.Cir.), *cert. denied,* 318 U.S. 782, 63 S.Ct. 856, 87 L.Ed. 1149 (1942). *See also DuPont Cellophane Co. v. Waxed Products Co.,* 85 F.2d 75 (2d Cir.), *cert. denied,* 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936), 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1539 (1938); *Bayer Co. v. United Drug Co.,* 272 F. 505 (S.D.N.Y.1921).

For example, to some consumers, EN PASSANT may be so different from most manufacturers' versions of chess that it is a wholly different game. As an example, suppose Chessco's EN PASSANT board has 81 instead of 64 squares. When a consumer calls for EN PASSANT, he may now be using the term EN PASSANT to describe game-relevant, but source-irrelevant, characteristics. That is, he wants EN PASSANT because it is a more interesting, longer, game than regular chess, not because Chessco's board is more durable, stylized, cheaper, or consistent as to quality compared to other chess boards. To this consumer, EN PASSANT has become a unique game and he uses the words EN PASSANT primarily to describe a game played with 81 squares, not to describe who makes the game equipment. We thus cannot infer from the consumer's asking for EN PASSANT any preference as to the production source of the desired game. Where before there was only one relevant product category or genus, chess, there are now two: chess and EN PASSANT. If Chessco wants to monopolize this product category, it may do so through a patent, but not through a trademark. In trademark genericness parlance, EN PASSANT has evolved from a species to a genus.

Once the genus-species distinction, or genericness doctrine, is properly understood as reflecting consumer usage of

---

4. Drawing upon antitrust law, Professor McCarthy has suggested that a genus or product category can be defined as including commodities for which " 'there is a cross-elasticity of demand,' ", *i. e.,* that are " 'reasonably interchangeable by consumers for the same purpose.' " 1 J. McCarthy, Trademarks and Unfair Competition § 12:8 at 418 (1973) (quoting *United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). If used, cross-elasticity of demand analysis, like the genus-species distinction itself, should focus upon consumer perception of product interchangeability.

a particular term, a court is prepared to ask the crucial question: whether consumers who ask for EN PASSANT are seeking the product of a particular producer (species), or are simply describing the product itself (genus)? Source identification is the only word function which trademark law is designed to protect. If the primary significance of the trademark is to describe the type of product rather than the producer, the trademark has become a generic term and is no longer a valid trademark.

On at least two occasions courts have invalidated a trademarked name of a game on genericness grounds. In *Selchow & Righter Co. v. Western Printing & Lithographing Co.*, 47 F.Supp. 322, 326 (E.D.Wis. 1942), *aff'd*, 142 F.2d 707, 709 (7th Cir.), *cert. denied*, 323 U.S. 735, 65 S.Ct. 75, 89 L.Ed. 589 (1944),[5] the court, applying the "primary significance" test, found:

> The plaintiff here has proved that buyers for large department stores and other like establishments have for years associated the name "Parcheesi" with the plaintiff company. But that does not hold true as to the general public, for it is very evident that an ordinary customer, going into a store and asking for the

game "Parcheesi", has no information as to who might have manufactured and produced that game. Not one purchaser in a thousand would know or care whether Selchow and Righter Company was the manufacturer. The fact is that the public in general knows "Parcheesi" as a game and not as an article made by the plaintiff.

In *Golomb v. Wadsworth*, 592 F.2d 1184, 201 U.S.P.Q. 200, 201 (Cust. & Pat.App.1979), the Court of Customs and Patent Appeals, in affirming the cancellation of the trademarked names POLYOMINOES and PENTOMINOES for domino-like game pieces, quoted from the Trademark Trial and Appeal Board's decision as follows: "these terms . . . have become words of art in the field of mathematical puzzles and *do not and cannot serve to designate origin in anyone* producing and selling a game which involves finding ways to fit together various shapes or configurations composed of numbers of connected squares." (Emphasis in original.) These decisions illustrate that when members of the consuming public use a game name to denote the game itself, and not its producer, the trademark is generic and, therefore, invalid.[6]

**5.** A prior case concerning the PARCHEESI mark, *Selchow v. Chaffee & Selchow Mfg. Co.*, 132 F. 996 (S.D.N.Y.1904), *appeal dismissed*, 140 F. 989 (2d Cir. 1905), is also instructive. There, the court declared the PARCHEESI mark invalid because it already signified the name of a game in the Indian language when registered as a mark in the United States.

**6.** In a third case, *H. B. Chaffee Mfg. Co. v. Selchow*, 131 F. 543 (S.D.N.Y.1904), *aff'd*, 135 F. 1021 (2d Cir. 1905), the court held that when the inventor of a card game "Flinch" failed to trademark its name, no one else could, by simply manufacturing the selling "Flinch" for a long period, obtain that name as a trademark. *Id.* at 545. The court stated:

> The general rule is that the generic name of a thing is not the subject of a trade-mark. . . . If chess or golf or whist were now invented and named, could any manufacturer or vendor of the ·implements with which such games are played obtain a trade-mark in their names by selling such implements put up in boxes marked with the names of the games? He, of course, could adopt a trade-mark to distinguish the chessmen or the playing cards or the golf clubs which he

made from those made by others, but I think he could not acquire a trade-mark in the names of the games by simply selling the games after they had become known to the public under such names.

*Id.* at 545–46. Although factually distinguishable, the "Flinch" case exemplifies the analysis used herein: that a trademark which the public uses primarily to denote the name of a game, rather than a producer, is generic.

Various other courts have mentioned, without deciding, the question whether the name of a game is a generic term. *See, e. g., Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 28 (2d Cir. 1978) ("The extent to which [SCRABBLE] has come into general use to describe a game or games rather than their origin or source of supply is fairly open to proof"; thus, plaintiff, owner of SCRABBLE mark, was entitled to a preliminary injunction to prevent the mark's dilution, pending judicial resolution of SCRABBLE's validity as a trademark); *Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1186, 1188–89 (2d Cir. 1975) (finding consideration for settlement agreement in possibility, strongly intimated by the district judge, that game name CARROM

### B. *The District Court's Findings*

The district court found as a fact that a small group of related people had played "Monopoly" in various parts of the country before Parker Brothers registered the MONOPOLY trademark. This, the court concluded, was "insufficient to prove that the term was the common descriptive name of all real estate trading games." Thus, the court held that MONOPOLY was not a generic term prior to registration.

The district judge also held that MONOPOLY had not become, since registration, a generic name. He first stated: "This assertion [that MONOPOLY is generic] contemplates a finding that the term monopoly now refers to all real estate trading board games and not to an individual game emanating from a single source." The court then found:

> The primary significance of MONOPOLY in this context is not that it describes all board trading games involving real estate trading but rather that it is the title of a particular and very popular board game produced by a single company. The public's understanding is that a particular game is called MONOPOLY and that game is produced by a single manufacturer.

Anti-Monopoly contends that neither of the district court's findings on genericness responded to the crucial issue regarding the validity of the MONOPOLY mark: whether Monopoly originally denoted or now denotes primarily the name of a game, or rather a game's producer. In its proposed findings of fact and conclusions of law, Anti-Monopoly had properly presented this precise issue when it urged the court to decide that

> [d]espite the efforts of defendant to police its mark, the primary significance today of MONOPOLY is, in the minds of the consuming public, the name of a game itself, and does not stand for the producer thereof. MONOPOLY has be-

come a generic term, the name of a game, and cannot serve as a trademark.

Anti-Monopoly claims that the district court erred because it failed to make the proposed finding. It contends that the district court picked the wrong genus—all board games involving real estate trading—for determining genericness, and thus obscured the basic issue: whether MONOPOLY primarily describes a product, or a producer.

We agree that the district court erred in focusing on whether the primary significance of MONOPOLY is to denote "all board games involving real estate trading," or instead a "particular and very popular board game produced by a single company." Presumably, the district court thought that for MONOPOLY to be a generic term, it would have to describe the genus "all board games involving real estate trading." Yet, if consumers think of MONOPOLY as a unique game, and differentiate it from all other real estate trading games by source-irrelevant characteristics, e. g., length of time it takes to play, or strategy involved, MONOPOLY may constitute its own genus. That is, the relevant product category to consumers may be the game played by the rules of "Monopoly," not all real estate trading games. Again, the crucial determination is just that requested by Anti-Monopoly: Do consumers use the term MONOPOLY primarily to denote the product, or instead to denote its producer? The district judge never confronted this issue, because once choosing the genus "board game involving real estate trading," he lumped together in the species category the two crucial alternative meanings: "a particular and very popular board game" or instead a game "produced by a single company." He had to differentiate between these latter two alternatives to decide the case properly.

It may be that when a customer enters a game store and asks for MONOPOLY, he means: "I would like Parker Brothers' ver-

invalid); *Application of Cooper*, 254 F.2d 611, 614–17, 45 CCPA 923, *cert. denied*, 358 U.S. 840, 79 S.Ct. 63, 3 L.Ed.2d 75 (1958) (holding a book title generic, because as the book's name it performs a product-denoting, not source-de-

noting function; observing that Patent Office may be registering names of games erroneously; and stating that if trademarked name of game is its only possible descriptive name, mark is generic).

sion of a real estate trading game, because I like Parker Brothers' products. Thus, I am not interested in board games made by Anti-Monopoly, or anyone other than Parker Brothers." On the other hand, the consumer may mean: "I want a 'Monopoly' game. Don't bother showing me Anti-Monopoly, or EASY MONEY, or backgammon. I am interested in playing the game of Monopoly. I don't much care who makes it."

In the first example, the consumer differentiates between MONOPOLY and other games according to source-particular criteria. In the second example, source is not a consideration. The relevant genus, or product category, varies accordingly. At the urging of Parker Brothers, the district court erred by first defining the genus, and then asking the "primary significance" question about the wrong genus-species dichotomy. The proper mode of analysis is to decide but one question: whether the primary significance of a term is to denote product, or source. In making this determination, the correct genus-species distinction, that is, the correct genericness finding, follows automatically.

■ We thus reverse the district court's findings as to the validity, when registered and thereafter, of the MONOPOLY trademark, and remand the case for further consideration consistent with the foregoing analysis.[7] There is a considerable amount of evidence in the record bearing on consumer usage of the term MONOPOLY. It may well be, therefore, that it will be unnecessary for the district court to receive new evidence on the validity issue. That decision will be left to the district court.

### III

■ In view of our remand on the invalidity issue, we also remand the question whether, if the MONOPOLY mark is valid, Anti-Monopoly's use thereof constitutes an infringement. The considerations affecting a determination of infringement are: the similarity in appearance, sound, and meaning of the marks, the strength or weakness of the marks, the proximity or similarity of the goods, evidence of actual confusion, the marketing channels used to market the goods, the type of goods and the degree of care likely to be exercised by the purchaser, the alleged infringer's intent in selecting the mark, and the likelihood of expansion of product lines. *E. g., AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir. 1979); *J.B. Williams Co. v. LeConté Cosmetics, Inc.,* 523 F.2d 187, 191 (9th Cir. 1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976); *HMH Publishing Co. v. Brincat, supra,* 504 F.2d at 717.

We have also stated, however, that

[w]hen the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected.[9]

[9 The alleged infringer's intent in adopting the mark is weighed, both as probative evidence of the likelihood of confusion and as an equitable consideration.]

*AMF, Inc. v. Sleekcraft Boats, supra,* 599 F.2d at 348. *See Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Habitat Design Holdings, Ltd. v. Habitat, Inc.,* 436 F.Supp. 327, 330–31 (S.D.N.Y.1977), *aff'd as modified,* 573 F.2d 1290 (2d Cir. 1978) (memo.); *Bass Buster, Inc. v. Gapen Mfg. Co.,* 420 F.Supp. 144, 160 (W.D.Mo.1976). *See also A. T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir. 1972). *Cf. Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 799–802 (9th Cir. 1970) (court states that "[n]umerous factors can and often do play a role in the determination of likelihood of confusion," *id.* at 800, but focuses analysis on evidence of actual confu-

---

**7.** It is significant, though not of course dispositive, that the original patent application in August 1935 divulged that "the game is known on the market as Monopoly." This usage, of course, predated any association of Parker Brothers with the game. This should be considered by the district court when analyzing whether, when registered, MONOPOLY primarily denoted the game's producer.

sion, and similarity of the marks in question).

Obviously, we cannot adequately review the district court's determinations, particularly as to the "similarity of meaning" and "competition" factors, without benefit of a finding whether the primary significance of MONOPOLY is to denote the name of a unique game, or instead the game's source. We do point out, however, that even if the district judge should decide that MONOPOLY is generic, it must be established, consistent with the decision in the *Shredded Wheat* case, that Anti-Monopoly is taking "reasonable care to inform the public of the source of its product." *Kellogg Co. v. National Biscuit Co., supra*, 305 U.S. at 119, 59 S.Ct. at 114. This issue is similar to the determinations required in finding infringement, and there is substantial evidence in the record bearing thereon. If the district court decides reasonable source-distinguishing steps are not being taken, it may enjoin the sale of "Anti-Monopoly" except upon its compliance with appropriate conditions. *See King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577, 581 (2d Cir. 1963); *Bayer Co. v. United Drug Co.*, 272 F. 505, 514–15 (S.D.N.Y.1921).

## IV

For the reasons just mentioned, we also remand to the district court, for further findings, the state law claims. Proper resolution of both the unfair competition and dilution issues demands, in part, inquiry into the "primary significance" of the MONOPOLY mark. Although such a finding may not be dispositive, we nonetheless await a determination that takes account of this factor. We also choose to defer consideration of Anti-Monopoly's unclean hands defense pending resolution of the aforementioned issues.

## V

Anti-Monopoly's last contention is that the district judge improperly denied it a jury trial. Anti-Monopoly places heavy emphasis on the procedural history of the case with respect to its demand for a jury trial. Anti-Monopoly points out that its original complaint contained two counts for damages, as well as its count seeking equitable relief, and that Parker Brothers had originally counterclaimed for an accounting and damages. Parker Brothers later withdrew this counterclaim, and moved, without objection from Anti-Monopoly, for severance of Anti-Monopoly's two legal claims. The district judge who was originally assigned, but who subsequently recused himself from the case, ordered that Anti-Monopoly be granted a jury trial. The district judge who ultimately heard the case, however, vacated that order, concluding that since only equitable claims remained to be tried, trial to a jury would be inappropriate.

Anti-Monopoly's allegation that pre-trial maneuvering by Parker Brothers in an effort to deprive it of a jury trial somehow vitiates the equitable nature of the case is not persuasive. Anti-Monopoly cannot complain about the severance of its legal claims, for it acquiesced in that action. Anti-Monopoly has not cited any authority for the proposition that, having once asserted a claim for damages, a party may not withdraw such a claim, or that upon such withdrawal a jury trial remains appropriate although only equitable issues remain in the case. *Lee Pharmaceuticals v. Mishler*, 526 F.2d 1115 (2d Cir. 1975) (per curiam), upon which Anti-Monopoly does rely, is authority only for the proposition that when a defendant counterclaims for damages, the plaintiff's withdrawal of its own prayer for damages does not entitle it to strike the defendant's request for a jury trial in an action for common law trademark infringement. *See id.*, at 1116–17.

Anti-Monopoly apparently also contends that the district court erred in denying it a jury trial because legal issues remain to be litigated in a related antitrust action which involves the earlier-severed legal claims. We disagree. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), upon which Anti-Monopoly relies heavily, held "that where both legal and equitable issues are *presented in a*

*single case,* 'only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims.' " *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472–73, 82 S.Ct. 894, 897, 8 L.Ed.2d 44 (1962) (emphasis supplied) (footnote omitted) (quoting *Beacon Theatres, Inc. v. Westover, supra,* 359 U.S. at 510–11, 79 S.Ct. 948). No legal issues remained to be tried in the district court in the matter which is now before us. The first district judge plainly erred in concluding that questions relating to the validity of the MONOPOLY trademark raised legal issues, although both parties sought only equitable relief. *See Shubin v. United States Dist. Court,* 313 F.2d 250, 251 (9th Cir.), *cert. denied,* 373 U.S. 936, 83 S.Ct. 1539, 10 L.Ed.2d 690 (1963); *Robine v. Apco, Inc.,* 227 F.Supp. 512, 516–17 (S.D.N.Y.1964), *aff'd,* 386 F.2d 267 (2d Cir. 1967). That being so, the order, vacating the earlier grant of a jury trial to Anti-Monopoly, was properly entered. *Cf. Daly v. Volpe,* 376 F.Supp. 987, 994 (W.D. Wash.1974), *aff'd,* 514 F.2d 1106 (9th Cir. 1975).

REVERSED AND REMANDED.