ANTI–MONOPOLY, INC., a California Corporation, Plaintiff,

v.

GENERAL MILLS FUN GROUP, INC., a Nevada Corporation, Defendant-Counterclaimant.

No. C–74–0529 SW.

United States District Court, N. D. California.

May 11, 1981.

Robert S. Daggett, Brobeck, Phleger & Harrison, San Francisco, Cal., Oliver P. Howes, Jr., Nims, Howes, Collison & Isner, New York City, for defendant and counterclaimant General Mills Fun Group, Inc.

Carl E. Person, New York City, John H. Denton, Oakland, Cal., for plaintiff.

## OPINION AND ORDER ON REMAND

SPENCER WILLIAMS, District Judge.

Plaintiff Anti-Monopoly, Inc., a California corporation which has engaged in the business of selling a board game it calls ANTI–MONOPOLY, brought this action challenging the validity and enforceability of defendant's MONOPOLY game trademark. After a trial before this court, a judgment was granted declaring the MONOPOLY trademark valid and enforceable, and that Anti-Monopoly's use of the name ANTI–MONOPOLY constituted an infringement thereof. On appeal to the Ninth Circuit Court of Appeals, the appellate court reversed and remanded to this court for a redetermination of the trademark validity issue. *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296 (9th Cir. 1979). In so doing, the Court of Appeals invited this court to entertain new evidence bearing on the validity issue, specifically the consuming public's perception and usage of the term "MONOPOLY."

Accordingly, the court received and considered proposals on both sides regarding the scope and content of further post-remand proceedings. On July 11 and July 18, 1980, the court conducted further evidentiary hearings. At the hearing the court received documentary evidence and the testimony of four witnesses. The court received and considered written arguments of counsel on the law and facts and, after the hearing closed and on July 22, 1980, the court heard and considered further oral argument of counsel. Having carefully considered the oral and documentary evidence received both at the trial and at the hearings after remand, and the oral and written arguments of counsel, and having observed the demeanor of the witnesses, the court now finds the following:

## I

## FACTUAL BACKGROUND

According to its creator, Ralph Anspach, a professor of economics, the primary focus of ANTI–MONOPOLY is to emphasize and support the values of the competitive private enterprise system. The game was first created in 1971, Anspach attempting unsuccessfully to market it under the name "BUST THE TRUST." Professor Anspach decided the problem lay in the name, which he changed to ANTI–MONOPOLY, thus achieving a notable market success. The game, as packaged, bears remarkable similarities to MONOPOLY in terms of box size, lettering, board configuration and design. Since the game was first sold in December 1973, plaintiff has sold approximately 419,000 games, taking in close to one million dollars.

Defendant and counterclaimant General Mills Fun Group, Inc. is a Nevada corporation engaged in business in California and elsewhere throughout the world with its principal place of business in Minnesota. Parker Brothers is an unincorporated division of defendant engaged in the business, among others, of manufacturing and selling games. Parker Brothers is the owner of the registered trademark MONOPOLY, No. 326,723 which was registered with the United States Patent and Trademark Office on July 30, 1935 and No. 338,834 registered on September 15, 1936. Parker Brothers' patent for MONOPOLY, issued December 31, 1935, expired in 1952.

For over forty-five years, Parker Brothers has been the sole producer of the real estate trading game known to the public as MONOPOLY. Since 1935, Parker Brothers and its predecessor have sold 80 million sets of the MONOPOLY game in the United States for $125 million. In the past ten years it has sold 24 million sets, and since 1973 its sales have approximated 80,000 sets annually. Parker Brothers has diligently and consistently promoted and policed its MONOPOLY mark, expending $4 million in publicizing the trademark since its first use, $2.1 million in publicizing the mark in the last ten years, and $234,000 in publicizing expense in 1976. Defendant has enjoyed exclusive use of its MONOPOLY trademark for all of this period, and the mark has not

been used by anyone else except plaintiff for board games or otherwise except under licenses and other permission granted by Parker Brothers.

## II

Three principal issues are raised on remand. First, and foremost, the question as to the validity of the MONOPOLY trademark has been remanded for redetermination in light of the Ninth Circuit's test explicitly set forth in *Anti-Monopoly, supra,* 611 F.2d at 306, to wit: "whether the primary significance of ... [the term, MONOPOLY] is to denote *product or source.*" Second, if the MONOPOLY mark is held valid, does Anti-Monopoly's use thereof constitute an infringement? And third, irrespective of the trademark validity issue, whether Anti-Monopoly's exploitation of similar "competition factors" with the MONOPOLY game produced by Parker Brothers constitutes unfair competition under state law.

## III

A. *VALIDITY OF MONOPOLY TRADEMARK.*

■ The thrust of plaintiff's argument is that the MONOPOLY trademark is invalid and should be cancelled either because (1) MONOPOLY was at the time of its registration, or has since become, the generic or common descriptive name of an article, or in this case, a game, or (2) the trademark was acquired through fraudulent means. Under 15 U.S.C. § 1064(c) a trademark may be cancelled if it becomes the common descriptive name of an article or substance or was obtained fraudulently. Unless one of these or certain other specified grounds exist, the right to use a trademark which has been in continuous use for five consecutive years after registration becomes incontestable and is conclusive evidence of the registrant's sole right to use the mark in commerce. 15 U.S.C. §§ 1065 and 1115(b).

After the initial trial, this court found against plaintiff on the fraud allegation, and plaintiff has not raised that issue on

appeal. The remaining issue involves the question of "genericness" of the MONOPOLY mark.

1. *Genericness At Time Of Registration.*

Plaintiff attempted to show at trial that at the time of Parker Brothers' trademark registration, MONOPOLY was already a widely played game known by that name. The evidence introduced to support this contention consists chiefly of isolated and sporadic examples of individuals playing old oilcloth games referred to in some instances as "Monopoly," the "Landlord's Game," or some other variation thereof. The Ninth Circuit found it "significant ... that the original patent application in August, 1935 divulged that 'the game is known on the market as Monopoly.' This usage, of course, predated any association of Parker Brothers with the game." 611 F.2d at 306, n.7.

This court finds the evidence to the contrary. Parker Brothers' MONOPOLY had been registered by trademark in July of 1935; one month before the patent application was filed. At the date of the patent application reference, thus, Parker Brothers had a clear association with MONOPOLY. Moreover, it must be recalled that MONOPOLY's inventor, Mr. Clarence Darrow, assigned his rights in the game to Parker Brothers in March, 1935.

■ In order to be "generic," the name MONOPOLY, in the minds of the consuming public, must primarily denote product rather than source. It remains unclear how widely played the precursors to modern MONOPOLY were in the 1920s and early '30s. Plaintiff has simply made no showing as to what the public's conception of the term was at that juncture or indeed how widely played it actually was. As Clarence Darrow, and later his successor, Parker Brothers, popularized a specific game they called MONOPOLY, this court cannot find that the trademark when registered denoted "a game" rather than the "game's producer." Because Anti-Monopoly has the burden of showing genericness by convincing evidence, *Feathercombs, Inc. v. Solo*

452

*Products Corporation,* 306 F.2d 251 (2d Cir. 1962), this finding must be for defendant.

### 2. Genericness Since Registration.

The primary issue before this court on remand relates to plaintiff's assertion that the MONOPOLY mark became generic in contemporary usage over time, so that current usage of the term "MONOPOLY" by consumers refers to the game and not the producer. In *Anti-Monopoly,* the Ninth Circuit determined that this court had employed the wrong test in determining genericness (by first defining the "genus" as "all board games involving real estate trading"). 611 F.2d at 305. As a result, this court "thus obscured the basic issue: whether MONOPOLY primarily describes a product, or a producer." *Id.*

■ This error transpired, the Ninth Circuit observed, because this court had "lumped together in the species category" the two alternatives between which the proper test was designed to discern: attribution to either *product or producer. Id.* Only if a trademark's "primary significance" is to denote the *source or producer,* as opposed to denoting the product itself, can the trademark be sustained. *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *Anti-Monopoly, supra,* 611 F.2d at 306. As Judge Learned Hand made clear in *Bayer Co., Inc. v. United Drug Co.,* 272 F. 505, 509

(S.D.N.Y.1921), the test relates to the average consumer's comprehension of the mark: "What do the buyers understand by the word for whose use the parties are contending?"

■ In a normal context this test is implemented by ascertaining whether a mark denotes a "particular producer's goods or services ... [or whether] the word is identified with all such goods or services, regardless of their suppliers." *Surgicenters of America v. Medical Dental Surgeries,* 601 F.2d 1011, 1016 (9th Cir. 1979). This is a straightforward task in markets where several producers manufacture the generic item in question. In this case, the analysis is complicated by the fact that Parker Brothers has been, and remains, the only producer to manufacture MONOPOLY since it acquired the rights to do so from MONOPOLY's creator, Mr. Clarence Darrow, in 1935.[1] The Ninth Circuit recognized this, explicitly applying its test in the one producer situation, so that even where "the public necessarily associates the product with that particular producer, the trademark is invalid *unless* source identification is its primary significance." 611 F.2d at 302.

However succinctly stated, the Ninth Circuit standard, unless it is intended to effectively foreclose trademark protection for any single producer of a unique game—*e. g.,* SCRABBLE[2] or TOWER OF BABBLE[3]

1. This case is sharply contrasted with both *Selchow & Righter Co. v. Western Printing & Lithographing Co.,* 47 F.Supp. 322, 326 (E.D. Wis.1942), *aff'd,* 142 F.2d 707, 709 (7th Cir.), *cert. denied,* 323 U.S. 735, 65 S.Ct. 75, 89 L.Ed. 589 (1944), and *Golomb v. Wadsworth,* 592 F.2d 1184, 201 U.S.P.Q. 200, 201 (1979). In *Selchow* the court found that other manufacturers were indeed also producing PARCHEESI (but under a different name), and that the origins of the game could be traced back centuries as a royal game of India. 142 F.2d at 708. Thus, the parallels to chess, checkers, backgammon and other venerated international games of unknown origin are far closer than here. MONOPOLY, this court has found, was "created" by Mr. Clarence Darrow and acquired by Parker Brothers.

Similarly, in *Golomb,* the Court of Customs and Patent Appeals noted that the asserted trademarks, "POLYOMINOES" and "PENTOMI-

NOES", had actually received public currency before the registrant had created his game titles ("POLYMINOES" reported to be widely popular three years before registrant claimed he brought them to the attention of the public.) 592 F.2d at 1186. This court has rejected a similar finding here.

2. In *Selchow & Righter Co. v. McGraw-Hill Book Co.,* 580 F.2d 25 (2d Cir. 1978), a preliminary injunction was granted against a possible infringement of the trademark SCRABBLE, a game solely produced by Selchow & Righter. The court held that the genericness question of SCRABBLE "is fairly open to proof." 580 F.2d at 28.

3. In *Dawn v. Sterling Drug Co.,* 319 F.Supp. 358 (C.D.Cal.1970), the court granted trademark protection (injunction) for the unique

—which this court believes it is not, it must be applied to the facts with some degree of care. In the case of the single producer of a unique item, it is a difficult and delicate task to separate product from source characteristics as they appear in the consumer's mind.

■ The parties presented additional survey evidence to this court which purport to make this fine distinction. The Anti-Monopoly survey, which was supposedly based on a specific guiding language in the Ninth Circuit's opinion, misconstrued the nature of the inquiry mandated by the Ninth Circuit in addition to manifesting a number of serious methodological flaws. The test set forth in that opinion requires a determination of the "primary significance" of the mark "MONOPOLY" in the average consumer's mind. It *does not* seek an explanation of an actual *purchaser's motivation for purchasing the game.* The two are not the same.

The Anti-Monopoly survey was restricted to persons who had purchased MONOPOLY within the past few years or who intended to purchase MONOPOLY in the near future. The survey asked three questions: (1) "Are you aware of 'MONOPOLY,' the *business board game produced by Parker Brothers* ?", (2) "Have you purchased MONOPOLY within the last couple of years?", or "Is it possible that you would buy 'MONOPOLY' now or in the near future either for yourself, as a replacement, or as a gift?", and (3) in the case of those who said they bought MONOPOLY within the last couple of years, "*Why did you buy 'MONOPOLY'* ?", and in the case of persons stating the possibility of future purchase in the words of the question put, "Why would you buy 'MONOPOLY'?".

Defendants contend that by its design, plaintiff's study avoids the very issue of this inquiry:

> The Anti-Monopoly survey states *in the first question* that MONOPOLY *is a "business board game produced by Parker Brothers."* The appellate opinion directs this Court to find whether or not MONOPOLY has a primary source identification. The Anti-Monopoly survey was not designed to gather source-related data but, instead, to assemble a mass of mixed, heterogeneous data from which to argue to this Court that the public purchases MONOPOLY for reasons primarily unrelated to source. The design accomplishes this, as we have seen, by including Parker Brothers as the name of the producer of MONOPOLY in the first question, and in this way *brushes aside as an assumed fact, the very fact on which the Ninth Circuit has mandated further inquiry.* [Emphasis added]

The court is in complete accord with this assessment of plaintiff's study.[4] Nevertheless, when given a specific choice between source and product attribution, plaintiff's own study finds that one in three consumers purchased (or would purchase) "MONOPOLY primarily because they like Parker Brothers' products."[5] Of course, while

---

game title TOWER OF BABBLE against its use as a slogan for Bayer Aspirin.

**4.** Other methodological deficiencies abound. The court finds that the design of the study was inherently biased towards a favorable outcome for Anti-Monopoly, including intimations that Prof. Anspach suggested the language which was used. Secondly, the scale which deduced the statistic that 82% of the MONOPOLY purchasers buy for "product related" reasons is: (1) overwhelmingly prone to errors of subjective grading, and (b) cannot be reconciled with the alternate finding that one of three buyers do so out of affection for Parker Brothers' products. The court rejects plaintiff's study.

**5.** Following the "open-end" questions, respondents were asked a structured question: "Which of these two statements best expresses your meaning when you ask [to purchase] . . . MONOPOLY in a store?" Choices: "(1) I would like Parker Brothers' 'MONOPOLY' game primarily because I like Parker Brothers' products." or "(2) I want 'MONOPOLY' game primarily because I am interested in playing 'MONOPOLY.' I don't much care who makes it."

These responses were pulled, verbatim, from an illustration in the text of the appellate court opinion. 611 F.2d at 305–306. Plaintiff's expert, not a trained attorney, misconstrued the purpose of the illustration, which was to illus-

it is significant that such a large percentage of MONOPOLY users purchased their games because of their affection for Parker Brothers' products, ascertaining the *motive* for a consumer's purchase is not the determination envisioned by the Ninth Circuit test. One fact which this court need not ignore is that most consumers, indeed an overwhelming proportion thereof, purchase any given product not out of goodwill or affection for the producer, but because they want or favor the product. Only a shareholder of the General Mills Fun Group (Parker Brothers' parent) could reasonably be expected to purchase a Parker Brothers' game out of an affection or goodwill for the corporation. Moreover, the "primary significance" of a trademark corresponds more to the recognition of a mark as the brand name of a particular producer than it does to a reason for purchasing. Consumers purchase games because they wish to play the games they seek, yet this fact alone should not serve to invalidate an otherwise legitimate trademark. The makers of MONOPOLY should not be penalized simply because they have created a unique product which they have actively and diligently promoted.

The dispositive issue hence is *not* why consumers buy MONOPOLY sets, but rather, what is their *understanding* of the name MONOPOLY? Does it primarily denote *product* or *producer*? In a single producer case (there is no other producer of MONOPOLY) it will not suffice to analyze source-related as opposed to source-irrelevant characteristics because most source related characteristics (*e. g.*, price, style, durability, quality, etc.) are purely relative terms, implying a comparison with product substitutes, or near substitutes. Here there are no substitutes; there is only MONOPOLY. Accordingly, the Ninth Circuit's mandate that this court divine the "primary signifi-

cance" of that term in the consumer's mind must necessarily involve subtle inferences into the complex, convoluted mind of the American consumer—an unenviable task.

The difficulty in this regard arises due to the public's dual usage of the tradename, denoting both product and source. For example, the mark "Ford" to the average consumer denotes *both* car and motor car company. However, to demonstrate "primary significance" it is necessary to show more than a high percentage of the consuming public who recognize MONOPOLY as a brand name (as defendant has done: 63% of those polled recognized MONOPOLY as a "brand name"). It is necessary to show more than a public awareness that Parker Brothers is the sole manufacturer of MONOPOLY (55% correctly identified Parker Brothers in defendant's survey). "Primary significance" logically implies a hierarchical priority over a competing alternative.

■ Yet the cumulative weight of the evidence does satisfy this court that the primary significance of MONOPOLY in the public's eye is to denote a "Parker Brothers' Game" (*i. e.*, source) in contradistinction to that "popular game of MONOPOLY" (product). Parker Brothers has expended substantial time, energy, and money in promoting and policing their trademark, expending over $4 million in advertising expenditures. One result of these diligent efforts has been the extraordinary success Parker Brothers has achieved in creating public source awareness. Over 55% of the American public correctly identified Parker Brothers as the producer of the game. *Cf. Selchow & Righter Co. v. Western Printing & Lithographing Co.*, D.C., 47 F.Supp. 322, 326 (court finding it "very evident that any ordinary customer, going into a store, and asking for the game "PARCHEESI" has no

trate a point, *not* to suggest language for a scientific study.

This weakness of plaintiff's study becomes most convincing when one considers defendant's TIDE survey. The TIDE survey showed that when TIDE is surveyed on a substantially identical design, 67.7% of its purchasers report that they buy (or would buy) TIDE because they simply like TIDE, 6.7% buy (or would

buy) TIDE for some other reason, 4.8% don't know, and only 12.8% report that they buy (or would buy) TIDE because of their affection for Proctor & Gamble products. Yet it seems beyond argument that TIDE is a valid trademark. But if TIDE were the *only detergent* available, would this mean that TIDE could *not* protect its trade name?

information as to who might have manufactured and produced the game.") An even more impressive display of the amount of goodwill which Parker Brothers has imbued throughout its various games—especially MONOPOLY—is *the finding of plaintiff's survey* that *one out of three MONOPOLY purchasers do so primarily because "they like Parker Brothers' products."* Hence, source attribution is a dominant perceived effect of the MONOPOLY trademark. This court cannot say from the facts before it that it is not the "primary significance" of the mark. Unless the Ninth Circuit standard is meant to foreclose the possibility of trademark protection for any producer of a unique game whose corporate name does not appear in the title of the game (*e. g.,* "SCRABBLE," "TOWER OF BABBLE"), then its test cannot be used here to thwart MONOPOLY's trademark rights.

## IV

### FINDINGS OF FACT

1. The court again finds as fact each fact found in this Opinion as set forth in the foregoing.

2. As a game trademark, MONOPOLY primarily denotes its producer, Parker Brothers, and primarily denoted its producer when registered.

3. The parties have offered no further evidence on the issue of trademark infringement. After further considering the matter in light of the preceding finding of fact, the court again finds that use of the name *ANTI–MONOPOLY* as the title of plaintiff's game and otherwise in connection with that game has created and creates a strong likelihood of confusion in the public mind.

4. The parties also have offered no further evidence on Parker Brothers' state law claims of unfair competition and trademark dilution or plaintiff's defense of unclean hands. After further considering all of the evidence in the light of Finding 2 above, the court again finds, for purposes of the state law claims, that there is a strong likelihood that the public will be deceived as to the source of the ANTI–MONOPOLY game due to confusion with the mark MONOPOLY; that plaintiff's name therefore dilutes Parker Brothers' trademark MONOPOLY; and that Parker Brothers has neither abused the MONOPOLY trademark nor committed any fraud in the acquisition of the original trademark.

5. The court further finds as fact anything set out below in its conclusions of law which is finding of fact or a mixed finding of fact and conclusion of law.

On the foregoing further Findings of Fact, the court now makes and enters the following:

## V

### CONCLUSIONS OF LAW

1. The court incorporates by this reference each Conclusion of Law contained in its Opinion and Order filed and entered April 4, 1977, except that the court has reconsidered in the light of the opinion of the Court of Appeals plaintiff's claim that the MONOPOLY trademark was generic when registered or has become so, 15 U.S.C. §§ 1065(4) and 1115(b)(2), as against the claim of defendant and counter-claimant that its right to exclusive use of the MONOPOLY mark is incontestable by reason of the same statutory provisions. After such reconsideration, which has included the matters embraced in Finding 2 above, the court again concludes that the MONOPOLY trademark is in all respects valid and enforceable and that use by plaintiff of the title ANTI–MONOPOLY for its game infringes the MONOPOLY trademark.

2. The court further concludes as law anything found as fact in the foregoing Findings of Fact which is either a conclusion of law or a mixed conclusion of law and finding of fact.

The court has this day entered its final judgment in conformity herewith.